**Neal Hampton ROBBINS, Appellant,**

v.

**The STATE of Texas.**

**No. 1939–00.**

Court of Criminal Appeals of Texas.

Oct. 23, 2002.

Brian W. Wice, Houston, for Appellant.

Gail Kikawa McConnell, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER and HOLCOMB, JJ., joined.

In this capital murder case the prosecution did not seek the death penalty against appellant, who was convicted and sentenced to life for killing the seventeen-

month-old daughter of his live-in girl-friend. The issue in this case is whether during the guilt/innocence phase of appellant's trial, the trial court abused its discretion to admit evidence of previous injuries the victim suffered while she was in appellant's care. We will refer to this evidence as "relationship evidence."

The prosecution presented evidence that the victim received the injuries that caused her death while she was alone with, and in the care of, the appellant in their home. Appellant and the victim lived with appellant's mother and the victim's mother. The victim's mother left the victim alone with appellant at home. When the victim's mother returned, appellant told her that the victim was taking a nap; appellant left soon thereafter. About an hour later, when the victim's mother attempted to wake the victim up from her nap, she noticed that the victim was cold and not breathing. The prosecution presented medical evidence that the victim was dead at this time.

Appellant suggested through vigorous cross-examination of prosecution witnesses that the victim's death was not the result of an intentional act by appellant. Through his cross-examination of one prosecution witness, appellant presented the defensive theory that the victim could have died from Sudden Infant Death Syndrome (SIDS) and not from an intentional act by appellant. Through his cross-examination of his parole officer who saw appellant and the victim on the day of the victim's death, appellant presented the defensive theory that he was treating the victim "kindly" with the obvious inference being that appellant would not have intentionally harmed the victim. And through his cross-examination of another prosecution witness, appellant presented the defensive theory that bruises on the victim's body could have been caused by incorrect-ly performed CPR efforts to save her life rather than from an intentional act by appellant. For example,

Q. Now, I'll give you another situation. An E.M.T. comes up to the location where the adults are trying to do CPR and they are putting a lot of pressure on that kid and blowing a lot harder than they should, and she says, "If she's not already dead, you're going to kill her; stop that," and proceeded to show them the proper way.

Would you say that some of that could have led to injuries to the child, adults putting their full weight down and trying to revive that child?

A. You should see it more anteriorly than posteriorly.

Q. Pardon?

A. You should see it more the front to the back, the injuries.

Q. If you've got your palms on the front and you've got little rocks and sticks on the back, you'll see it on the back, you'll see it on the back, won't you?

A. Yes. You'd see bruises on the back.

Q. But you wouldn't necessarily see them on the front if they're pushing with their palms, would you?

A. No.

Q. And they could be misfiring and hitting down in the area of the eleventh and twelfth ribs and cause that sort of damage without any noticeable trauma from looking at the skin, couldn't they?

A. If they're pushing down lower, yes.

Q. Pass the witness.

The victim's mother and other witnesses later testified over appellant's objection about the relationship evidence. They testified that on three separate occasions the victim received injuries while she was in appellant's care. For example, the victim's mother testified that on one occasion

while in appellant's care, the victim received a black eye. On another occasion while in appellant's care, the victim's "leg was so badly injured she couldn't stand up." And, on another occasion while in appellant's care, the victim "appeared with bruises in her ear and on the side of her face."

Appellant testified that he loved the victim and would not have harmed her. Appellant presented seemingly innocent explanations for how the victim suffered the injuries described in the relationship evidence. Appellant also presented medical expert testimony that the victim's cause of death was "undeterminable" and that the victim's death-causing injuries could have occurred at a time when appellant did not have access to her.

During closing jury arguments, appellant argued that if "anything, he is guilty of the offense of loving a child." He also pointed to the testimony of the two medical examiners who came to "two diametrically-opposed conclusions" about the victim's death: one that "this is a death of undeterminant cause" and the other that it is "a homicide." Appellant put forth the SIDS scenario, and he also emphasized that the bruises on the victim's body could have been caused by incorrectly performed CPR efforts to save the victim's life. Finally, appellant argued:

> [Appellant] loved the [victim]. The [victim's] own mother said she never saw him yell at the [victim], discipline the [victim]. And everybody else, save for [two witnesses], said they had a loving relationship, got along well; and told how much he loved [the victim] and spent time caring for her. And I don't

think there is any doubt about the relationship they had up to [the day of the victim's death]; and there is nothing, nothing that would explain [appellant] doing this terrible thing.

Our reading of the record indicates that the trial court admitted the relationship evidence under Article 38.36(a), V.A.C.C.P., and also overruled appellant's objections that this evidence was inadmissible under Rules 404(b) and 403 of the Texas Rules of Evidence.[1] The Court of Appeals decided that this evidence was "probative of intent and lack of accident" under Rule 404(b) and that it was not "unfairly prejudicial" under Rule 403 because "the prejudicial effect lies in its probative value rather than an unrelated matter." *Robbins v. State*, 27 S.W.3d 245, 250–51 (Tex.App.-Beaumont 2000, pet. granted). We exercised our discretionary authority to review the Rule 404(b) and Rule 403 decisions of the Court of Appeals.

**RULE 404(b)**

 Relevant evidence of a person's bad character is generally not admissible for the purpose of showing that he acted in conformity therewith. *See Montgomery v. State*, 810 S.W.2d 372, 386–88 (Tex.Cr.App. 1990) (op. on reh'g); *accord Rankin v. State*, 974 S.W.2d 707, 709–10 (Tex.Cr.App. 1996) (orig.op.), and at 717–20 (op. on reh'g). This evidence, however, may be admissible when it is relevant to a non-character conformity issue of consequence in the case such as establishing intent or rebutting a defensive theory. *See id.; Montgomery*, 810 S.W.2d at 387–88.

 Because trial courts are in the best position to decide these admissibility

---

1. The prosecution apparently claimed that the Texas Rules of Evidence could not apply to exclude this evidence because its admissibility was governed exclusively by Article 38.36(a). This claim was rejected in *Smith v. State*, 5 S.W.3d 673, 679 (Tex.Cr.App.1999) (evidence that is admissible under Article 38.36(a) may still be excluded under the Texas Rules of Evidence).

questions, an appellate court must review a trial court's admissibility decision under an abuse of discretion standard. *See Montgomery*, 810 S.W.2d at 391 (trial court "has the best vantage from which to decide" admissibility questions). This standard requires an appellate court to uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *See id.* An appellate court would misapply the appellate abuse of discretion standard of review to reverse a trial court's admissibility decision solely because the appellate court disagreed with it. *See id.*

Appellant claims the Court of Appeals' holding that the relationship evidence "was admissible to show intent and absence of accident is clearly wrong as neither intent nor accident was a material issue given Appellant's denial that he committed this offense." Appellant argues that, because he merely "denied committing the offense," his "intent" or "absence of accident" was "wholly irrelevant." The State urges this Court to decide that appellant's simple plea of not guilty made appellant's intent a material issue in the case and that the relationship evidence was probative of that intent as well as other relevant issues of consequence in the case such as absence of accident.

The State relies primarily on the United States Supreme Court's decision in *Estelle v. McGuire* which held that relationship evidence was "clearly probative" of the defendant's intent in the defendant's murder prosecution for killing his infant daughter, even though at trial the defendant simply pled not guilty and made no claim that the child died accidentally. *See Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 480–81, 116 L.Ed.2d 385 (1991). The Supreme Court rejected a claim like the one appellant makes here on the rationale that "a simple plea of not guilty" still "puts the prosecution to its proof as to all elements of the crime charged" and that this burden is not relieved by a defendant's tactical decision not to contest an essential element of the offense. *See Estelle*, 112 S.Ct. at 481.

■ The State candidly admits that adopting its position would probably require this Court to overrule or disavow prior case law and we agree. A fair reading of this case law indicates that in Texas a simple plea of not guilty usually does not make issues such as intent a relevant issue of consequence for purposes of determining the admissibility of relationship evidence under Rule 404(b). *See, e.g., Vernon v. State*, 841 S.W.2d 407, 411 (Tex.Cr. App.1992) (in defendant's prosecution for aggravated sexual assault of his minor stepdaughter, relationship evidence of prior sexual assaults by the defendant against the same victim not relevant to a noncharacter conformity material issue under Rule 404(b) primarily because the not-guilty pleading defendant did not present any witnesses of his own or do anything to impeach the complainant); *Fielder v. State*, 756 S.W.2d 309, 318 (Tex.Cr.App. 1988) (theory of the prosecution and the defensive theory or theories determine the material issues in a homicide case); *Turner v. State*, 754 S.W.2d 668, 673–74 (Tex. Cr.App.1988) (considering it relevant that not-guilty pleading defendant did not testify and personally deny committing the offense in deciding that it was error to admit extraneous transaction between defendant and a third party); *Clark v. State*, 726 S.W.2d 120, 122–23 (Tex.Cr.App.1986) (extraneous offense evidence involving defendant and third party erroneously admitted on issue of defendant's intent in part because the not-guilty pleading defendant did not vigorously enough undermine the prosecution's "case on the issue of intent").

Current law, therefore, creates a "catch 22." It says that a simple plea of not guilty does not make issues such as intent relevant issues of consequence for relationship evidence Rule 404(b) purposes while at the same time it also says that these are material issues that the prosecution must prove beyond a reasonable doubt. Some might agree that this current case law is "wrong."

But this standing alone is not sufficient for us to disregard principles of *stare decisis*. *See generally Awadelkariem v. State,* 974 S.W.2d 721, 725–26 (Tex.Cr.App.1998). One consideration here is that this Court's 8–0 (with one judge concurring in the result) decision in *Vernon* disavowed a prior "small plurality" decision in *Boutwell v. State* which would have supported the State's position in this case. *See Vernon,* 841 S.W.2d at 410–11, *disavowing Boutwell v. State,* 719 S.W.2d 164, 173–79 (Tex. Cr.App.1985) (op. on reh'g) (plurality op.) (discussion of why relationship evidence of prior unlawful sexual acts between defendant and the victim were admissible in prosecution of defendant for committing unlawful sex acts against the same victim).

Other than demonstrating that our current case law might be "wrong," the State advances no reasons for disregarding principles of *stare decisis*. With these considerations in mind, this case presents a scenario where it is probably "better to be consistent than right." *See Awadelkariem,* 974 S.W.2d at 725. Any changes in current law should come via amendment to the Texas Rules of Evidence or by legislative enactment.

■ Under current law, therefore, the issue is whether appellant went beyond a simple plea of not guilty and put his intent at issue through vigorous cross-examination or other means (such as the presentation of various defensive theories), thereby making it subject to reasonable debate

whether the relationship evidence was relevant to this noncharacter conformity purpose of establishing appellant's intent. Appellant argues that he did not put his intent at issue. While *Vernon* suggests that a defendant's simple plea of not guilty does not put intent at issue for Rule 404(b) purposes, it does not address the situation where a defendant puts intent at issue through vigorous cross-examination and the presentation of defensive theories.

Of crucial import here is the fact that this is not a case where appellant simply pled not guilty. He went beyond simply pleading not guilty through vigorous cross-examination of the prosecution witnesses suggesting that the victim's death was caused by some means other than an intentional act by appellant. As a matter of logic and common sense it is at least debatable whether this is sufficient to put appellant's intent at issue. *See Montgomery,* 810 S.W.2d at 387, 394. Keeping in mind that the deferential appellate standard of review does not permit the appellate court to conduct a *de novo* review with a view to making a wholly independent judgment of the trial court's admissibility decision, we cannot say that the trial court would have been outside the zone of reasonable disagreement to have decided that the relationship evidence was relevant to appellant's intent. *Cf. Montgomery,* 810 S.W.2d at 392.

Our decision in *Montgomery* also does not support appellant's position. *Montgomery* decided that in an indecency with a child prosecution it was "at least subject to reasonable debate whether the testimony that [the defendant] frequently walked around in front of his daughters naked and with an erection, in combination with other evidence of inappropriate behavior toward them, did have a tendency to show a generalized '**intent** to arouse and gratify' his own sexual desire *vis-a-vis* his children."

*Montgomery,* 810 S.W.2d at 394 (emphasis supplied). Similarly, it is subject to reasonable debate in this case whether the relationship evidence tended to show appellant's intent to hurt the victim.

Notwithstanding the foregoing, the trial court would not have abused its discretion to have decided that the relationship evidence was relevant for the noncharacter conformity purpose of rebutting appellant's various defensive theories including the defensive theory that the victim's death resulted from an accident due to improperly performed CPR efforts to save her life. *See Montgomery,* 810 S.W.2d at 387–88 (extraneous offense evidence relevant to noncharacter conformity fact of consequence in the case when it is offered to rebut a defensive theory); see also *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Cr.App.1990) (appellate court should uphold trial court's decision if it is correct on any theory of law applicable to the case and this principle holds true "even when the trial [court] gives the wrong reason for his decision" and "is especially true with regard to admission of evidence"). It too is subject to reasonable debate whether the relationship evidence made these defensive theories less probable. *See Montgomery,* 810 S.W.2d at 387 (extraneous offense evidence has noncharacter conformity relevance where it logically serves to make less probable defensive evidence that undermines an elemental fact).

**RULE 403**

■ An appellate court also reviews a trial court's Rule 403 decision under the above-mentioned abuse of discretion standard. *See Montgomery,* 810 S.W.2d at 391–93. The Rule 403 appellate issue is usually whether the trial court abused its discretion to decide that the probative value of the evidence "is substantially outweighed by the danger of unfair preju-

dice." *See* Montgomery, 810 S.W.2d at 391–93.

In making this determination, it is important to remember that each word in Rule 403 is significant. For example, it appears that appellant misquoted Rule 403 in the Court of Appeals by arguing "the probative value of the [relationship] evidence was outweighed by its prejudicial effect." *See Robbins,* 27 S.W.3d at 250. This is a misstatement of Rule 403 which, in relevant part, actually reads "evidence may be excluded if its probative value is **substantially** outweighed by the danger of **unfair** prejudice." (Emphasis Supplied).

The Rule 403 analysis advances the "overriding policy" of excluding what most agree is relevant and probative character evidence when it is offered solely for the purpose of showing that a defendant acted in conformity therewith. *See generally Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948).

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. (Footnote Omitted). Not that the law invests the defendant with a presumption of good character, (citation omitted), but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. (Footnote Omitted). The inquiry is not rejected because character is irrelevant; (footnote omitted) it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny

him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. (Footnote Omitted).

*Id.*

■ This "overriding policy" of preventing "undue prejudice" is meant primarily to prevent a jury, with a reasonable doubt of a defendant's guilt of the charged offense, from nevertheless convicting the defendant of the charged offense based solely on the defendant's "wicked or criminal disposition" or solely because the defendant is a bad person generally. *See Crank v. State,* 761 S.W.2d 328, 341 (Tex.Cr.App. 1988); *Michelson,* 69 S.Ct. at 219, and at 225 (Rutledge, J., dissenting) (rule designed to "prevent conviction for one offense because perhaps others, or misconduct not amounting to crime at all, have been perpetrated or are reputed generally to lie at the defendant's door"); 1 Wigmore, *Evidence* (3d ed., 1940), Section 57 ("tendency of human nature to punish, not because our [defendant] is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury"); 2 Ray and Young, *Texas Law of Evidence* (2d ed., 1956), Section 1492 (purpose of rule is to protect defendant from the "undue prejudice" that "when evidence is received that accused is of a wicked or criminal disposition, juries are likely to find him guilty of the offense charged regardless of whether it is proved by the evidence"). It also has been stated that this "overriding policy" is to prevent digression "from evidence as to the offense to hear a contest as to the standing of the accused" and to prevent "converting an individual litigation into a community contest and a trial into a spectacle." *See Michelson,* 69 S.Ct. at 220.

■ With these considerations in mind, we cannot say that the Court of Appeals wrongly decided that the trial court was within its discretion to decide that the probative value of the relationship evidence was not **substantially** outweighed by the danger of **unfair** prejudice especially in light of the defensive theories that appellant presented. Though "prejudicial," the evidence was not "unfairly prejudicial." And, any "unfair prejudice" did not "substantially" outweigh the probative value of the evidence even if it could be said that it "outweighed" its probative value. On this record, there was no reason to believe that the jury had a reasonable doubt for appellant's guilt of the charged offense but convicted appellant based on the relationship evidence.

The judgment of the Court of Appeals is affirmed.

KELLER, P.J., joined in part.

KELLER P.J., filed a concurring opinion.

KEASLER, J., filed a concurring opinion in which HOLCOMB, J., joined.

COCHRAN, J., filed a concurring opinion in which WOMACK and JOHNSON, JJ., joined.

KELLER, P.J., filed a concurring opinion.

I agree with the part of the Court's opinion that holds that the disputed evidence was admissible to rebut the defensive theory of accident. I do not agree, though, that the evidence was admissible to show intent, or that there is a catch-22 in Texas law.

As I read *Estelle v. McGuire*,[1] the Supreme Court did not hold that evidence of prior injuries to a child is admissible to show intent—it merely held that its admission under California state law did not violate the federal constitution. Prior to this Court's opinion in *Smith v. State*,[2] an analogous situation would have existed in Texas. Article 38.36 of the Code of Criminal Procedure would have made the disputed evidence admissible and *McGuire* would have established that there was no constitutional impediment to its admission.

But although Article 38.36 still exists, it is a now a statute utterly without effect. Before *Smith*, evidence of injuries previously inflicted by an accused upon a homicide victim was presumptively admissible. After *Smith*, the evidence is presumptively inadmissible. So, under *Smith*, the evidence in this case was inadmissible unless it met a Rule 404(b) exception. And although "intent" is a Rule 404(b) exception, because appellant did not claim that *he* injured the child by accident, his intent was not raised. While the Legislature could revive Article 38.36 (or try to[3]) by adding language like that in Article 38.37 § 2, at this juncture evidence of prior injuries is generally not admissible in the State's case-in-chief to show intent.

But I also agree with Judge Cochran that the evidence of the child's injuries was admissible to show the *corpus delicti* of the crime. The cause of Tristen's death, 'compression asphyxia,' was not an obvious result of intentional homicide. Her death, viewed in a vacuum, could well have been considered an accident. So, in this case, even if appellant had not himself raised the issue of accident, the nature of the injuries

did. The evidence was, therefore, admissible in the State's case-in-chief to show that the child's death was the result of an intentional act rather than an accident. Because the evidence was admissible in the State's case-in-chief, it is unnecessary to determine whether appellant raised issues that would have made the evidence relevant for other purposes.

I join the Court's opinion in part and otherwise concur in the result.

KEASLER, J., filed this concurring opinion, joined by HOLCOMB, J.

Like radioactive waste, the fallout from *Smith v. State*[1] continues to wreak havoc on the landscape of the law. The majority does not mention *Smith*, but if that misbegotten opinion had not been handed down, the trial court's ruling would be unquestionably correct, and there would be no issue for us to decide.

In *Smith*, a bare majority of this Court held that Art. 38.36, which mandates admission of "relationship evidence" in a murder prosecution, is limited by Evidence Rules 403 and 404(b). The Court came to this conclusion despite Rule 101(c), which specifies that statutes trump rules of evidence. The Court's conclusion is particularly stunning in light of the sweeping, mandatory language of Art. 38.36, which seemingly speaks for itself:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship between the accused and the deceased, together with all relevant facts and circumstances going to show the condition

---

1. 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

2. 5 S.W.3d 673 (Tex.Crim.App.1999).

3. See, e.g., *Grunsfeld v. State*, 843 S.W.2d 521 (Tex.Crim.App.1992).

1. 5 S.W.3d 673 (Tex.Crim.App.1999).

of the mind of the accused at the time of the offense.

This language is forceful and unambiguous:

- All prosecutions for murder.
- Shall be permitted.
- All relevant facts and circumstances surrounding the killing and the previous relationship between the accused and the deceased.
- All relevant facts and circumstances showing the mind of the accused.

But *Smith* eviscerated Art. 38.36 and rendered the statute meaningless. Now, the "relationship evidence" which Art. 38.36 requires to be admitted at trial is no different from any other evidence offered by the parties—it is admissible only if it passes through the gateway of the rules of evidence. Of course, if that were what the Legislature had intended, there would have been no need for Art. 38.36 at all. Post-*Smith*, the statute remains in the Code, but it is a shell of its former self, present in body but not in spirit.

I believed at the time, and I still believe today, that the *Smith* majority erred. Nevertheless, given the fact that the Court has spoken on this point and *Smith* is law, I reluctantly join the majority's opinion.

COCHRAN, J., filed a concurring opinion joined by WOMACK, and JOHNSON, JJ.

I concur in the majority's conclusion that the trial court did not abuse its discre-

tion in admitting evidence of previous injuries that seventeen-month-old Tristen suffered while she was in appellant's sole care.[1] I would hold that evidence showing that Tristen repeatedly suffered various physical injuries when left in appellant's care was admissible to prove the corpus delicti of murder.[2] I believe that the court of appeals correctly concluded that "[t]he State had to prove Tristen's death was the result of the intentional act of the defendant, rather than an accident on his part or the intentional act of [another]." *Robbins v. State*, No. 9–99–120–CR, slip op. at 10 (Tex.App.-Beaumont 2000) (not designated for publication).

I.

The State's evidence at trial showed that appellant lived with his mother, his girlfriend, Barbara Hope, and Barbara's seventeen-month old daughter, Tristen. Barbara and appellant had a tempestuous relationship. They argued, split up, and reunited several times. Appellant's personality began to change after he started taking Vicodin for injuries he received in a car accident. Although Tristen and appellant once had a good relationship, by the end of January, 1998, Tristen would no longer allow appellant to pick her up. She seemed afraid of him; she started "cowering from him and would cry."

Beginning in November of 1997, Tristen suffered several physical injuries while she was in appellant's sole care. One evening in late November, appellant babysat for

---

1. We granted appellant's petition for discretionary review on the following grounds:
 1) Whether the court of appeals erred in upholding the trial court's decision to admit extraneous acts under Tex.R. Evid. 404(b) involving the victim and appellant.
 2) Whether the court of appeals erred in upholding the trial court's decision to admit extraneous acts under Tex.R. Evid. 403.

2. *See Salazar v. State*, 86 S.W.3d 640, —— (Tex.Crim.App., 2002) (quoting 7 JOHN WIGMORE, EVIDENCE § 2072 (Chadbourne rev. 1978)); *see also Fisher v. State*, 851 S.W.2d 298, 303 (Tex.Crim.App.1993) ("The corpus delicti of a crime—any crime—simply consists of the fact that the crime in question has been committed by someone").

Tristen. The next morning she had a black eye. Appellant explained that injury by saying that he had been bathing Tristen when the child fell in the bathtub and hit her nose. Another time, Tristen's mother took a nap, leaving appellant to watch the child. When she awoke, she discovered that Tristen couldn't walk. In fact, Tristen was so badly injured that she could not stand up or walk for several days. Appellant explained that he had accidentally stepped on Tristen's heel, causing the injury. In early February, three months before Tristen's death, appellant was babysitting the child when Tristen's ear was injured and she suffered bruises on her face and neck. Appellant explained that he had been taking a shower with Tristen and the child slipped and fell in the shower. Appellant maintained that these incidents were simply the result of his "carelessness."

On May 12, 1998, appellant was alone with Tristen for most of the day. Barbara heard Tristen talking before she left home that morning. When appellant's parole officer visited the house in the early afternoon, Tristen appeared to be healthy and "mellow." But when Barbara returned home around 4:00 p.m., appellant told her that Tristen was taking a nap, and, after a brief argument, he left. Barbara checked on Tristen at 5:40 p.m., but didn't disturb her because she appeared to be sleeping. At 6:00 p.m., Barbara decided to wake Tristen up, but when she approached her child, she saw that Tristen's lips were blue and the child was "ice cold." She picked Tristen up and carried her into the living room where appellant's mother was sitting. She tried to breathe into Tristen's mouth, but a pink fluid came gurgling out of Tristen's nose and mouth. Barbara then went outside and started yelling for "anybody to help me," while appellant's mother called 911. Before the ambulance arrived, both appellant's mother and a neighbor performed CPR on Tristen, to no avail. Tristen appeared to be dead before the paramedics arrived. The emergency room doctor thought that Tristen had been dead for some time.

The medical examiner testified that Tristen died from compression asphyxia. She also found a hemorrhage on the left kidney which indicated that force had been applied in that area, as well as blunt force hemorrhages on her chest, indicating that force had been applied to Tristen's back. The medical examiner ruled out CPR as the cause of death because the injury to Tristen's kidney was deep down and required considerable force. She also ruled out SIDS (Sudden Infant Death Syndrome) as a possibility because of Tristen's age "and the story doesn't fit the picture of a SIDS baby death." The State's position was that someone forcefully crushed Tristen to death, and that someone was appellant in whose sole care the child had been left.

Appellant testified and denied ever intentionally striking or abusing Tristen. He stated that he committed no act that caused or led to Tristen's death. The defense medical expert testified that Tristen's cause of death was "undetermined." The defense also theorized that the bruises and injuries noted in the autopsy report were caused by the CPR efforts to resuscitate Tristen.

## II.

The State offered evidence during its case-in-chief of prior injuries that Tristen had suffered while she was in appellant's sole care as some proof that Tristen died as the result of a criminal homicide. This testimony was admissible in the State's case-in-chief because the cause of Tristen's death was not an obvious result of intentional homicide. The circumstances were

such that Tristen's death could have been considered a tragic accident were there no other evidence. The evidence of her prior injuries, suffered while in appellant's care, supports a finding that Tristen died as the result of a human act rather than as the result of an accident or some undefined natural cause.

As the Fourth Circuit explained in *United States v. Woods*,[3] in allowing evidence, during the government's case-in-chief, of prior instances in which numerous other children in defendant's care had died or suffered cyanotic episodes:

> We think also that when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. A child of the age of [deceased victim] and of the others about whom evidence was received is a helpless, defenseless unit of human life. Such a child is too young, if he survives, to relate the facts concerning the attempt on his life, and too young, if he does not survive, to have exerted enough resistance that the marks of his cause of death will survive him. Absent the fortuitous presence of an eyewitness, infanticide or child abuse by suffocation would largely go unpunished.[4]

Here, as in *Woods*, the State offered the evidence of prior incidents to prove the *corpus delicti* of the crime.

The situation here is also similar to that in the renowned English case, *Rex v. Smith*.[5] In that case, Smith was charged with murdering Bessie Mundy by drowning her in the bath tub.[6] Smith had recently married Ms. Mundy, who, coincidentally, had inherited a significant sum of money.[7] He had taken his new "bride" to a doctor, saying that she was in ill health, but the doctor found nothing wrong with Ms. Mundy. At first blush, Ms. Mundy's death appeared to be an accidental drowning. However, the prosecution was then allowed to introduce evidence that two other women: (1) had "married" Smith; (2) were found drowned in the bath tub; (3) had insured their lives at Smith's suggestion; and (4) had been taken to doctors by Smith shortly before their deaths, with Smith asserting that they were in ill health.[8] The logical proposition was that one drowned bride is an accident, two are suspicious, and three make murder. Smith was convicted upon what Wigmore called "the doctrine of chances" because the likelihood of three such coincidental events occurring naturally was logically improbable.[9] The evidence was not of-

---

3. 484 F.2d 127 (4th Cir.1973).

4. *Id.* at 133.

5. 11 Cr.App. R. 229, 84 L.J.K.B. 2153 (1915).

6. 84 L.J.K.B. at 2154.

7. *Id.* at 2153–54. In fact, Smith was already married, but he went through a marriage ceremony with Ms. Mundy and they lived together as man and wife. *Id.*

8. *Id.* at 2154.

9. Texas courts have adopted and repeatedly applied Wigmore's "doctrine of chances" in criminal cases. In *Plante v. State,* 692 S.W.2d

487 (Tex.Crim.App.1985), for example, this Court quoted Wigmore:

> "Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them."

*Id.* at 49–92 (quoting 2 John Wigmore, WIGMORE ON EVIDENCE § 302 (Chadbourn rev. ed.1979)); *see Morgan v. State,* 692 S.W.2d 877, 881–82 (Tex.Crim.App.1985) (under doc-

fered to prove that Mr. Smith had a "drowning" or "murderous" character trait, but to show that it was more likely that Ms. Mundy died from a criminal act because two of Mr. Smith's other brides had died under very similar circumstances. The repetition of similar unusual events over time, involving Smith and different brides, made it possible for the jury to conclude that Mundy's drowning was caused by Smith's intentional act rather than by an inadvertent accident or a health problem.[10]

In the present case, the fact that, as the State notes, "things started to happen to Tristen physically" when she was in appellant's sole care, increases the probability, however minimally, that "something" happened to Tristen while appellant took care of her on the day of her death. None of these incidents, taken alone, conclusively demonstrates that appellant intentionally harmed Tristen on those prior occasions or on the charged occasion. None of them prove any character trait possessed by appellant. But evidence that Tristen repeatedly suffered physical injuries while she was in appellant's care increases the probability that Tristen's injury on the day of her death was the result of some act, careless or otherwise, committed by appellant.

The United States Supreme Court expressed this theory of logical improbability in *Estelle v. McGuire*.[11] In that case, the defendant was charged with murdering his infant daughter. The defendant told police that the child's fatal injuries must have resulted from a fall off the family couch or that "[m]aybe some Mexicans came in" and did it while he was upstairs.[12] The prosecution then introduced evidence that the child had suffered numerous earlier injuries, as well as expert testimony regarding "battered child syndrome." The defendant objected, stating that the prosecution had failed to show that he had inflicted any of the earlier injuries or that those injuries were intentionally inflicted.[13] According to the Supreme Court:

> evidence demonstrating battered child syndrome helps to prove that the child died at the hands of another and not by

---

trine of chances, trial court did not abuse its discretion in admitting evidence that defendant touched complainant's and her sister's genitals on other occasions).

**10.** *See id.; see also* 1 John W. Strong, McCormick on Evidence § 190, at 663–64 (West 1999) (recounting case of *Rex v. Smith* and explaining the theory of implausibility). Other judicial examples of this "logical improbability" theory include *Makin v. Att'y Gen. of New South Wales, supra,* note 6 (evidence of the remains of 13 other children found buried on the defendant's property admissible in murder of one boy; "the recurrence of the unusual phenomenon of bodies of babies having been buried in an unexplained manner in a similar part of premises" implied that the deaths were "wilful and not accidental") (cited and discussed in *McCormick*); *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) (in prosecution for defrauding insurance company after murdering his business partner, putting her body in jointly owned

bar, and destroying bar by setting off explosives, evidence that defendant had collected life insurance proceeds on former business partner three years earlier, although he was never charged with murder, admissible under Wigmore's doctrine of chances because "the odds of the same individual reaping [life insurance] benefits, within the space of three years, of two grisly murders of people he had reason to be hostile toward seem incredibly low, certainly low enough to support an inference that the windfalls were the product of design rather than the vagaries of chance. ... This inference is purely objective, and has nothing to do with a subjective assessment of [defendant's] character").

**11.** 502 U.S. 62, 68–69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

**12.** *Id.* at 65, 112 S.Ct. 475.

**13.** *Id.* at 71–72, 112 S.Ct. 475.

falling off a couch for example; it also tends to establish that the "other," whoever it may be, inflicted the injuries intentionally. When offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries.[14]

The State did not offer expert evidence of "battered child syndrome" in this case, but evidence of Tristen's prior injuries was relevant for precisely the same reasons as those expressed in *McGuire*. Tristen's prior injuries made it somewhat less probable that her death was the result of SIDS or some other purely indeterminable and accidental cause of death.

Here, as in *Rex v. Smith*, one physical injury may be purely the result of accident. But because Tristen suffered four such injuries within a single six month period, each of them while under appellant's care, the probability that sheer accident caused each injury decreases significantly.

Therefore, because the evidence of Tristen's prior injuries was admissible for a non-character purpose to prove the *corpus delicti* of the crime, I concur in the judgment.