In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-02-00174-CR
______________________________


JEB TRAVIS CARTER, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 183rd Judicial District Court
Harris County, Texas
Trial Court No. 910299


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter
Dissenting Opinion by Justice Ross



O P I N I O N

            A Harris County jury convicted Jeb Travis Carter of aggravated assault. The indictment
alleged Carter did intentionally and knowingly threaten Richard Sydenstricker with imminent bodily
injury by using and exhibiting a deadly weapon, namely, a metal pipe. The jury assessed Carter's
punishment at five years' community supervision. The issue presented concerns of whether the trial
court erred in allowing into evidence Carter's prior juvenile delinquency adjudications. We affirm
the judgment of the trial court.
Factual History
            According to the State's evidence, the following events occurred in March of 2002, leading
to Carter's indictment for aggravated assault. Carter was living in an apartment with complainant
Sydenstricker and Luke Myer. The three roommates were joined on one occasion by Mark Diogu,
Chase Hall, and Jimmy Huval.


 Myer became upset that Diogu, Hall, and Huval were visiting so
frequently, and due to his frustration, an argument ensued. A physical altercation broke out between
Myer and Diogu, and Huval also became involved. At some point, Diogu ended up on top of Huval,
threatening to stab him. Carter approached Sydenstricker in order to prevent him from acting for the
benefit of Huval. Carter swung at Sydenstricker, but missed. Sydenstricker then struck Carter,
breaking his nose. Carter left the apartment, returning later that evening to get some clothes. He did
not continue to reside there. 
            On April 28, 2002, Sydenstricker and two coworkers, Hall and Daniel Stout, were driving
their employer's moving truck and stopped at a Texaco station to get something to drink. While
Sydenstricker visited with a friend outside the station, he saw Carter, Diogu, and Dedrick Moore
drive up in Carter's car. Carter, Diogu (both carrying metal pipes) and Moore got out of the vehicle
and started running toward Sydenstricker. 
            Sydenstricker went back to the truck, and the three men left the station. Carter and company
pursued the truck which Sydenstricker was driving. Sydenstricker drove past the men's place of
employment, but did not stop since no one else appeared to be on the premises. Eventually, he
returned to the Texaco station, parked near the front door, and, along with the other two men, got
out of the truck. Sydenstricker carried a pipe wrench, and Hall ran away from the station. 
Sydenstricker and Stout went into the station and asked someone to call the police. When the two
looked outside, Carter and Moore had caught and were hitting Hall. When Sydenstricker and Stout
went outside to help Hall, Carter and Diogu came after Sydenstricker. Sydenstricker threw the
wrench he had been carrying, but did not hit anyone. Carter and Diogu struck Sydenstricker with
the pipes, and Sydenstricker went back inside the store; Carter and Diogu followed. After striking
Sydenstricker several more times, Carter and Diogu left the store, went to the moving truck, and
broke a window. Sydenstricker and Stout called the police from inside the store. A customer at the
service station had made note of Carter's license plate number and gave the number to Stout. 
            Officer Bryan Bennett of the Houston Police Department arrived at the station, met with the
three men and the clerk at the store, and witnessed Sydenstricker's and Hall's injuries on their torsos,
chests, and backs. Bennett also viewed the store videotape of the incident, in which it appeared to
him that the victims were retreating from the assailants, who appeared to be carrying some type of
weapon. Bennett drove to the location where the vehicle was registered and was able to talk to
Carter's father. While Bennett talked with Carter's father, Carter and the two other men drove into
the driveway. Bennett ordered the men to get out of the vehicle and to place their hands on the patrol
car. Moore complied with the request, but Carter and Diogu became hostile and began cursing. 
While Bennett was putting Diogu and Moore in the patrol car, Carter ran into his house. Eventually,
Bennett removed a kicking and screaming Carter from the house and placed him under arrest. 
            Carter's version of events varied drastically from the State's evidence, putting Sydenstricker,
Hall, and Stout as the aggressors and asserting he acted in self-defense. At trial, the following
exchange occurred during direct examination of Carter:
[Defense Counsel:] We're going to get to the point where you guys lived in
an apartment; you, Rich and Luke. Prior to that had you ever had a -- prior to -- other
than playing on a basketball court or a football field ever had any altercations with
pipes or weapons or anything like that?
 
[Carter:] No.

Later, on cross-examination, the State was allowed to question Carter concerning a juvenile offense
involving reckless injury to an elderly individual and a juvenile offense for assault.


 
To Correct a False Impression
            The State argues that evidence of the assault and reckless injury to an elderly individual
adjudications are admissible to correct the false impression left by Carter's direct testimony that he
had never been in a violent altercation before this incident.
            A witness cannot be impeached with a prior offense unless the offense resulted in a final
conviction for either a felony or a crime involving moral turpitude and the conviction is not too
remote in time.


 Tex. R. Evid. 609; Ochoa v. State, 481 S.W.2d 847, 850 (Tex. Crim. App. 1972). 
An exception to this general rule arises when a defendant, during direct examination, leaves a false
impression as to the extent of either his or her (1) arrests, (2) convictions, (3) charges, or (4)
"trouble" with the police. Turner v. State, 4 S.W.3d 74, 79 (Tex. App.—Waco 1999, no pet.). When
the accused leaves a false impression during direct examination, he or she "opens the door" for the
State to inquire into the veracity of his or her testimony. Id. In doing so, the State may introduce
evidence of specific incidents of bad acts for which he or she is not on trial, evidence which is
otherwise generally inadmissible.


 Id. 
            Cases which have held that the State's evidence was admissible because the accused opened
the door by creating a false impression indicate that the false impression must be much clearer than
the testimony we have here. For example, an appellant's specific denial of ever having committed
an armed robbery rendered police testimony concerning a previous robbery admissible. Gilmore v.
State, 493 S.W.2d 163, 164 (Tex. Crim. App. 1973). A defendant's testimony also opened the door
for the State's impeachment evidence to correct the false impression when he testified that he "had
not been in trouble before." Alexander v. State, 476 S.W.2d 10, 11 (Tex. Crim. App. 1972). On
cross-examination, the State was allowed to question Alexander about a specific instance in which
he was arrested for theft. Id. When a defendant answered "no" to defense counsel's question
whether he had ever "been convicted of a felony or a misdemeanor or paid a fine or anything of that
nature?" he, too, opened the door for the State to introduce evidence of a prior fine and jail sentence
imposed on the appellant. Orozco v. State, 164 Tex. Crim. 630, 301 S.W.2d 634, 635 (1957). 
            The case before us most resembles that presented to the Texas Court of Criminal Appeals
in Prescott v. State, 744 S.W.2d 128 (Tex. Crim. App. 1988). In Prescott, the court confirms that
the statement in question must be read within the context of the testimony: "When attempting to
determine the meaning of a response, the predicate question is a determinative interpretive tool." 
Id. at 131. Defense counsel posed the question, "Do you find anything unusual that the lawyer
decided to work on your case took two statements one day?" Prescott responded, "Well, I'm--this
is my first time of going through this. Hopefully my last. In other words, I don't--I'm not sure about
the legal lawyer (pause) whatever," . . . "procedures." Id. The court held that Prescott's response was
not a deliberate attempt to portray himself as one ignorant of the criminal justice process. At most,
the statement could be considered ambiguous, the meaning of "this" being uncertain. Id. Ambiguity,
concluded the court, was insufficient to open the door to impeachment. Id. at 132–33. 
            Here, Carter's testimony, like Prescott's, did not create a false impression that Carter had
never participated in any violent altercation. A reasonable reading of the testimony in its proper
context reveals that the testimony centers around a description of the relationship among the young
men involved in this controversy rather than Carter's entire history of violent or criminal activity. 
Before the statement in question, Carter explained he had known Sydenstricker since he was thirteen
or fourteen. He testified they "hung out" together and played basketball. Then defense counsel
stated, "We're going to get to the point where you guys lived in an apartment; you, Rich and Luke,"
and then asked "had you ever had a -- prior to -- other than playing on a basketball court or a football
field ever had any altercations with pipes or weapons or anything like that?" Immediately following
the answer, Carter described his relationship with Sydenstricker as really good and he trusted him. 
Carter further stated that he moved into Luke's apartment in March or April 2002; that he, Moore
and Myer lived there; that they smoked marihuana, drank beer, worked, and played ball. 
Sydenstricker moved in a week after Moore.
            The question referred to "you guys" and then specifically to "you, Rich and Luke." When
viewed in its context, the answer to the specific question "had you ever had a -- prior to -- other than
playing on a basketball court or a football field ever had any altercations with pipes or weapons or
anything like that?" does not appear to leave the false impression that Carter had never committed
a violent act or been arrested, but that this group of young men had never gotten into a violent
altercation among themselves.


 
            After examining the context within which the question was asked, we hold that Carter did
not open the door by having left a false impression. The question concerned his relationship with
the others ultimately involved in this altercation. Thus, the State's impeachment evidence was
inadmissible under this theory.
To Refute a Defensive Theory
            However, a portion of the State's evidence is admissible to refute the defense's theory of self-defense.


 As a general rule, "one on trial is to be tried for the offense charged and not for remote or
disconnected crimes or for being a criminal generally." Halliburton v. State, 528 S.W.2d 216, 218
(Tex. Crim. App. 1975). This means that evidence of extraneous bad acts are inadmissible for the
purpose of showing that a defendant acted in conformity therewith. Robbins v. State, 88 S.W.3d
256, 259 (Tex. Crim. App. 2002). However, the State may introduce evidence of an extraneous
offense to refute a defensive theory raised by the accused. Halliburton, 528 S.W.2d at 218. 
            More specifically, when an accused claims self-defense, as did Carter, the State may show
the accused's intent by showing other violent acts in which the accused was the aggressor. Id.;
Johnson v. State, 963 S.W.2d 140, 144 (Tex. App.—Texarkana 1998, pet. ref'd). Carter argues that
other parties, especially Sydenstricker, were the aggressors in the matter, that Carter only wanted to
talk, had tried to walk away, and was put in fear by Sydenstricker's actions. The State, as a result,
was free to introduce evidence that demonstrated prior violent episodes in which Carter acted as the
aggressor.
            The State's evidence of Carter's juvenile case involving assault, thus, was properly admitted. 
A person commits the offense of assault if he or she (1) intentionally, knowingly, or recklessly
causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly
threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or
knowingly causes physical contact with another when the person knows or should reasonably believe
that the other will regard the contact as offensive or provocative. Tex. Pen. Code Ann. § 22.01
(Vernon Supp. 2004). Therefore, by its very definition, an adjudication of delinquency for assault
would have to include an aggressive act by Carter. Evidence of such conduct can be used to refute
Carter's theory that the other men were the aggressors and that he acted in self-defense.
            The State's evidence regarding reckless injury to an elderly individual, however, is another
matter. This offense can involve an act of aggression or violence. Tex. Pen. Code Ann. § 22.04(a)
(Vernon 2003). One can also commit the offense through an omission. Tex. Pen. Code. Ann.
§ 22.04(b) (Vernon 2003). The record before us does not include a copy of the judgment, and the
testimony does not reveal any details of the offense. Therefore, we cannot say that the adjudication
for reckless injury to an elderly individual would fall under the exception allowing evidence of an
accused's prior violent acts to refute his theory of self-defense. We simply cannot say that Carter
acted violently with respect to the offense; it may be that the offense arose from a failure to act.
            That being said, the State's evidence as to Carter's adjudication of guilt with respect to the
reckless injury to the elderly individual was not admissible. For reasons set forth below, however,
the error in admitting the evidence was harmless error. 
            Error in admitting prior convictions under the "false impression" doctrine without regard to
the limitation imposed by Tex. R. Evid. 609 is a nonconstitutional error governed by Tex. R. App.
P. 44.2(b). Lopez v. State, 990 S.W.2d 770, 777 (Tex. App.—Austin 1999, no pet.). In considering
harm, the entire record must be reviewed to determine whether the error had more than a slight
influence on the verdict.  King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).
            The record in this case consists of a substantial amount of properly admitted evidence
weighing in favor of guilt. One unusual feature of this case is that the jury had a videotape recording
of the altercation to review in determining the issues. Further, we have found that admission of the
assault was proper in rebuttal of the self-defense theory. No documentary evidence was offered as
to either prior conviction, and the State did not emphasize this evidence in its jury argument.
            We conclude that error in admitting the State's evidence did not affect substantial rights and
find it to be harmless.
Conclusion 
            Having concluded that the State's evidence of Carter's assault was admissible to refute
Carter's assertion of self-defense and that admission of the evidence regarding Carter's reckless injury
to an elderly individual was harmless error, we overrule Carter's sole point of error. Accordingly,
we affirm the trial court's judgment.
 
 
                                                                        Jack Carter
                                                                        Justice



DISSENTING OPINION
            The majority concludes, and I agree, the juvenile adjudications were not admissible to correct
a false impression after Carter had "opened the door." Yet, this is precisely the basis on which this
evidence was offered and admitted, as shown by: 1) the discussion between counsel and the court
at the extensive hearing held on this matter outside the presence of the jury; 2) the State's predicate
questions leading to the admission of this evidence; and 3) the court's limiting instruction to the jury
that such evidence was "admitted before you for the purpose of aiding you, if it does aid you, in
passing upon the weight you will give [Carter's] testimony, . . . ." 
            At no time was this evidence tendered or received "to refute the defense's theory of self-defense," which is the basis on which the majority concludes the juvenile adjudication for assault
was admissible. In so concluding, the majority ignores the trial court's additional instruction to the
jury that "[s]uch evidence [the juvenile adjudications] cannot be considered by you against the
defendant as any evidence of guilt in this case" and that the jury was not to consider such evidence
for any purpose other than weighing the credibility of Carter's testimony. 
            Admission of the juvenile adjudication "to refute the defense's theory of self-defense"
certainly bears on Carter's guilt, and the trial court specifically and unequivocally instructed the jury
not to consider this evidence for that purpose. We generally presume the jury follows the trial court's
instructions. Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); Graham v. State, 96
S.W.3d 658, 661 (Tex. App.—Texarkana 2003, pet. ref'd). 
            The majority concludes, and I agree, it was error for the trial court to admit evidence of the
juvenile adjudication for reckless injury to an elderly individual. The majority concludes, however,
that the error was harmless. For the reasons stated above, I would hold that the jury did not properly
hear that Carter had a juvenile adjudication for assault and that the admission of both these prior
juvenile adjudications had more than a slight influence on the verdict.
            I respectfully dissent.
 


                                                                        Donald R. Ross
                                                                        Justice 

Date Submitted:          February 23, 2004
Date Decided:             April 6, 2004

Do Not Publish