In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00071-CR


______________________________




CLAYTON D. SIMMONS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the County Court at Law


Harrison County, Texas


Trial Court No. 2006-0209



 




Before Morriss, C.J., Carter and Cornelius,* JJ.


Memorandum Opinion by Justice Carter


*William J. Cornelius, C.J., Retired, Sitting by Assignment


MEMORANDUM OPINION



 A Harrison County jury convicted Clayton D. Simmons of misdemeanor assault involving
family violence. See Tex. Penal Code Ann. § 22.01(a)(1) (Vernon Supp. 2007). (1) The trial court
sentenced Simmons to 365 days in jail, probated for twenty-four months, and a $4,000.00 fine. He
appeals that conviction, contending the trial court abused its discretion by admitting improper
character evidence through unadjudicated and extraneous offenses. He also maintains that, even if
the trial court did not abuse its discretion by admitting such evidence, the trial court abused its
discretion when it concluded that the probative value of such evidence outweighed its prejudicial
effect pursuant to the balancing tests outlined in Rules 403 and 609. (2) We will reverse and remand
the cause.

I. FACTUAL BACKGROUND

 Simmons and his wife, Christie, were going through a rather contentious divorce at the end
of the year 2005 and early part of 2006. Christie had filed her petition for divorce in November 2005
and, on January 13, 2006, Simmons filed his counterpetition for divorce seeking custody of the
children. 

 The evidence adduced at trial depicted conflicting accounts of the events of January 17, 2006,
four days after Simmons filed his counterpetition. According to Christie, Simmons had moved out
of the house when the couple decided to separate. He came to the house unannounced that day
between two and three o'clock in the afternoon to, perhaps, visit with one of their twin boys who was
sick and had stayed home from school. Simmons and their son were chatting in a room near the back
door when Christie noticed it was nearly time to go pick up the other children from school. When
she went back to let Simmons know she had to leave, he asked if the two could talk. Fearing that
he wanted to talk about the divorce and that she would likely get upset, she requested the two go
outside to talk so their son would not have to hear the conversation. 

 She testified that Simmons began talking, and she told him that he was going to have to leave
because she had to go pick up the children. Simmons, instead, continued to talk to her, eventually
becoming angry and starting to curse. She insisted that he had to leave so that she could go pick up
the children and made her way to the truck and sat down. As she sat in the driver's seat, Simmons
had one arm on the hood and one arm on the open truck door as he continued to talk about the
divorce. Christie decided to go get the son out of the house, but as she tried to get out of the truck,
Simmons blocked her. He then "kind of" shoved her in the chest and knocked her back into the
console of the truck. Simmons continued to yell and curse and moved away from the truck door,
leading Christie to believe she could then get out of the truck. As she moved toward the door,
Simmons slammed the truck door on her wrist, causing redness, pain, and swelling. 

 Christie reported the event to the Marshall Police Department after she picked the children
up from school. She also reported the event to her divorce lawyer, who filed her application for
protective order approximately eight days later, on January 25, 2005. 

 According to Simmons, he did, in fact, go over to the house January 17. He had locked
himself out of his mother's house and needed to take a shower. Since he and Christie had been
getting along fine, he decided to ask to shower over there and Christie permitted him to do so. He
explained that he and Christie had been out to dinner within the few preceding days and had been
discussing the divorce in a civil manner. After he took a shower, he went to ask if he could have a
conversation with Christie. He, too, testified that Christie expressed a need to go pick up the
children and noted that both parents wanted to talk outside the presence of the child at home.

 Once outside and sitting in the truck, Christie complimented his new haircut and asked who
had cut it. When he answered that a former friend of Christie had cut his hair, Christie became
"extremely furious." Christie, who it seems had suspected her former friend of having some type
of inappropriate relations with Simmons, then began hitting Simmons in the chest with her fists as
Simmons stood by the open truck door. Simmons explained that he put his arm up to block the
blows. Simmons stepped away from the open door as Christie gassed the vehicle to take off in a
backward direction. As the front of the truck passed him, he knocked the hood of the truck and
"flipped her off." 

 Based on the January 17 incident, Simmons was charged with assault involving family
violence. Also based, in part, on the January 17 altercation, Christie filed an application for a
protective order. It appears this application may have been abandoned at the end of January. (3) As
a part of the divorce proceeding, Christie requested that Simmons take a drug test, which he failed.

 At the trial on the assault charges, Simmons made clear that his defensive theory was that
Christie had fabricated the allegations of assault so as to gain an advantage in the divorce and child
custody matters. He made that argument in his opening statement to the jury and cross-examined
Christie on her previous accounts of January 17, pointing out the inconsistencies in her testimony,
police report, and affidavit in support of her application for a protective order. 

II. APPLICABLE LAW

 A. Rule 404(b)

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person
in order to show action in conformity therewith. Tex. R. Evid. 404; Powell v. State, 63 S.W.3d 435,
438 (Tex. Crim. App. 2001); Montgomery v. State, 810 S.W.2d 372, 386-88 (Tex. Crim. App. 1990)
(op. on reh'g). It may, however, be admissible for other purposes, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,
provided that, on timely request by the accused in a criminal case, reasonable notice is given in
advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising
in the same transaction. Tex. R. Evid. 404; Powell, 63 S.W.3d at 438.

 The list included in Rule 404(b) is not exhaustive. "If it were intended for the Rule to allow
an exception only for proof of motive, opportunity, intent, preparation, plan, knowledge, identity,
or absence of mistake or accident, then it would not have included the phrase 'other purposes, such
as . . . .'" Garcia v. State, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006). This language makes clear
there are additional "other purposes" for which evidence of prior acts may be admitted. Id. It is well
established that one of those other purposes is rebutting a defensive theory. (4) See Robbins v. State,
88 S.W.3d 256, 259 (Tex. Crim. App. 2002); Taylor v. State, 920 S.W.2d 319, 321 (Tex. Crim. App.
1996); Montgomery, 810 S.W.2d at 388. The Texas Court of Criminal Appeals has stated that
"evidence will be relevant to a material issue if the purpose for which the party seeks to have it
submitted tends to make 'the existence of any fact that is of consequence to the determination of the
action more probable or less probable than it would be without the evidence.'" Smith v. State,
5 S.W.3d 673, 679 n.13 (Tex. Crim. App. 1999); Rankin v. State, 974 S.W.2d 707, 718-19 (Tex.
Crim. App. 1996) (op. on reh'g). The range of material issues in each case will depend on the
theories of the prosecution and the defense in that case. See Garcia, 201 S.W.3d at 703; Smith,
5 S.W.3d at 679 n.13. 

 B. Standards of Review

 We review a trial court's ruling on the admissibility of evidence under Rule 404(b) for an
abuse of discretion. Powell, 63 S.W.3d at 438.

III. ANALYSIS 

 A. Evidence That Simmons Failed a Drug Test

 Evidence that Simmons failed a drug test associated with the divorce proceedings came into
evidence unexpectedly as Christie responded to defense counsel's cross-examination on her
recollection of the filing of Simmons' counterpetition seeking custody of the couple's three children:

 [Defense Counsel:] Okay. Now, when did you receive his paperwork that
stated that he was asking to be appointed the managing conservator with the
obligation to establish the primary residence of the children?

 

 [Christie:] I don't recall ever receiving that.


 [Defense Counsel:] When did you find that out?

 

 [Christie:] I don't recall having to fight for that.

 

 [Defense Counsel:] Ma'am?

 

 [Christie:] I don't recall him asking for custody.

 

 [Defense Counsel:] You don't?

 

 [Christie:] No. It was never any - -

 

 [Defense Counsel:] Are you clear about that? Your lawyer didn't tell you? 
You didn't get served?

 

 [Christie:] I don't recall any of that. No.

 

 [Defense Counsel:] Okay. You recall a great deal of other things, but you
don't recall any of this about him - -

 

 [Christie:] I recall him getting a lawyer, yes. And I recall when he failed the
drug test, there was no doubt about what was going to happen.

 

 [Defense Counsel:] Your Honor, may we approach?

 

 [Christie:] There was no way he was going to get custody.

 

 [Defense Counsel:] Your Honor, may we approach?

 After Christie's nonresponsive answer and comment came in during cross-examination,
defense counsel objected to the statement as nonresponsive and that it interjected extraneous bad
acts. A lengthy discussion ensued outside the presence of the jury. The trial court stated that, if the
drug testing occurred before Simmons' counterpetition, it seemed to be relevant. The trial court
concluded that the failure of the drug test was relevant to undermine the defensive theory that
Christie fabricated the allegations to impact the child custody issues. At the end of the discussion,
the trial court overruled the objections and denied defense counsel's request for an instruction to
disregard the testimony concerning the drug test and also denied defense counsel's motion for
mistrial. 

 1. Timing and relevance of drug test results

 As Christie's comment following defense counsel's request to approach the bench
demonstrates, it appears Christie was not concerned with any possibility that Simmons would get
custody of the children. From the argument that followed, it appeared the State took the position that
the evidence was relevant to undermine the theory that Christie fabricated the allegations to damage
Simmons' attempt to get custody of the children.

 During the time the trial court was considering objections to the drug test evidence, Simmons
stated the drug test occurred after the January 17 incident. At a later stage of the trial, evidence was
admitted that the drug test was taken January 30, 2006. This was approximately two to three weeks
after Christie reported the assault and gave a written statement to the police. It was also about two
weeks after Christie made the allegations in her affidavit in support of her application for protective
order. We conclude that the timing of the test results make it considerably less likely that the results
of the drug test would provide Christie with any assurance, at the time she made the allegations that
Simmons assaulted her January 17, that Simmons had no chance of obtaining custody of the
children. 

 The record demonstrates that Christie reported the assault shortly after it occurred January 17
and that her divorce lawyer filed her application for a protective order January 25. Thus, it appears
the failure of the drug test January 30 would not be relevant to undermine the defensive theory that
Christie fabricated the allegations of the assault two to three weeks earlier. Simply put, she could
not have known about the drug test results at the time she made statements to the police and signed
the affidavit for a protective order. Therefore, the evidence Simmons failed the drug test weeks after
the allegation of assault lends no relevance beyond demonstrating poor character through a prior bad
act, the very purpose prohibited by Rule 404(b).

 2. Harm analysis

 When reviewing nonconstitutional error, we must disregard the error when it does not affect
substantial rights. Tex. R. App. P. 44.2(b); Tex. R. Evid. 103(a). A substantial right is affected
when the error had a substantial and injurious effect or influence in determining the jury's verdict. 
King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A particular error does not affect a
substantial right if "the appellate court, after examining the record as a whole, has fair assurance that
the error did not influence the jury, or had but a slight affect." Gray v. State, 233 S.W.3d 295, 299
(Tex. Crim. App. 2007) (quoting Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). 
To assess the likelihood that the jury's decision was adversely affected by the erroneous admission
of evidence, we consider the entire record, including the other evidence admitted, the nature of the
evidence supporting the verdict, and the character of the error in light of the other evidence in the
case. See Motilla v. State, 78 S.W.3d 352, 357-58 (Tex. Crim. App. 2002). We also consider the
arguments of counsel and the extent to which the State emphasized the improper evidence. See id.
at 357.

 Here, we note that the evidence concerning the drug test results came in unexpectedly during
cross-examination. That is, the State did not purposely elicit Christie's testimony on the results and,
subsequently, did not elicit any further testimony from Christie. The next mention of the drug test
results came from Simmons, who explained he had been ill and had also been taking antidepressants
for a period during the divorce. He admitted that, in his past, he had used drugs, but denied using
illegal drugs now. He added he was subject to drug testing at his job in the healthcare field. He
explained that, when the extraordinarily high levels came in from that test, he went to get another
test done the very same day. The implication is that prescription medications skewed the test results. 
He also testified he has passed all of the several other drug tests he has taken, including a more
comprehensive hair analysis. On cross-examination, the State pointed out that the results were
extremely high for methamphetamine and opiates and questioned Simmons about not bringing in
an expert to testify about later results:

 [State:] I'm just talking about -- regardless of any experts, just
mathematically speaking it is 400 times higher than the cut-off.


 [Simmons:] Okay. 

 [State:] And you said you were told by folks at the testing facility, maybe
your doctor - - where are you getting this knowledge that something else could have
caused this or triggered this positive reading?

 

 [Simmons:] The medical review officer at the clinic.

 

 [State]: And you realize that this is going to be something that - - I know if
I was sitting on that jury panel, I would think that is very serious.

 

 [Simmons:] Sure, it is serious.

 

 [State:] A very serious issue in this case.

 

 [Simmons:] Yes.

 

 [State:] And this is the day of your trial. Do you have anybody here who is
going to come testify that is a medical expert, doctor, pathologist, toxicologist to let
this jury know that, yes, that is possible that anti-depressants caused that reading? 
Do you have anybody here to give that testimony or just is this just stuff you heard
through the grapevine?

 

 [Simmons:] Today?

 

 [State:] Yes, today. Anybody coming to testify?

 

 [Simmons:] I didn't know this was going to be brought up.


The State then left the topic and returned to more issues of past infidelity having occurred in 1999
while the couple was married and relating little to the assault. 

 During argument to the jury, the State again mentioned the failure of the drug test: "Think
of the drug results. Two weeks after this occurred, he is off the charts for a drug test. And he claims
in this flimsy testimony, oh, it was some anti-depressants I was on." Defense counsel answered that
argument:

 We've heard things in the divorce about drug use. My client said, yeah, I've
used drugs in the past. I used them with her. And, yeah, I took a drug test. I've taken
[a] lot of drug tests since then. I take drug tests at work when I'm required to do so. 
I don't know what - - why that drug test came back, but I ran and had another one
done and I've had drug tests ever since then. Nothing. This is not a case about drugs,
ladies and gentlemen. That's just a bias and a prejudice they are trying to use against
my client.


On rebuttal, the State revisited the issue:

 Flunks a drug test. Mr. Solomon wants you to say, "Hey, you've got to
believe that beyond a reasonable doubt." He admitted that he did it; and if he's
passed all these other ones, once again, where are they? Why didn't he bring those
and say, "Hey, Jurors, I've ten other ones I passed." Oh, no, they don't have the
burden. Once they put it out there, Folks, you've got to believe it. If you don't
believe it, hold it against them. Don't let them sit there and go, "Oh, we don't have
the burden. We can just throw this junk up here. We can just say she did this and we
don't really have to prove it. We can just say she did it and you ought to believe it
because, guess what, we don't have the burden." Wrong. That's not the way it works. 
This is not the way it works.


From this excerpt, it appears the State's argument centers on whether Simmons did or did not use
drugs, allegations entirely separate from the charges of an assault. While several misdeeds and
character flaws were raised by both sides during trial, it is during argument that the strongest
emphasis was placed on Simmons' drug use, which had no relevance other than to demonstrate he
had committed another crime. 

 Even though the State did not originally seek to introduce the drug test evidence, the State
warmly embraced such evidence and emphasized it throughout the trial. It cannot be concluded this
emphasis was justified, because Simmons attempted to answer and explain the inadmissible
evidence. A party has the right to explain or rebut inadmissible evidence to which he or she has
objected and been overruled by the trial court. If the testimony is inadmissible, an attempt to
minimize its impact does not forfeit a right to complain of the inadmissible evidence or authorize
the State to continue to emphasize it. See Maynard v. State, 685 S.W.2d 60, 66 (Tex. Crim. App.
1985); Alvarez v. State, 511 S.W.2d 493 (Tex. Crim. App. 1973).

 The trial court gave a general limiting instruction in the jury charge as to evidence of other
crimes or wrongful acts, even though the drug test evidence was admitted without limitation. 
Conceivably, the limiting instruction in the jury charge related to the evidence of another extraneous
offense, the alleged prior altercation. Regardless of any instruction, the State made great effort to
connect the drug test results to the assault by arguing to the jury that "[t]wo weeks after this occurred,
he is off the charts for a drug test." The State then argued to the jury about burdens of proof in such
a way as to direct the jury's attention to the drug test results. We add that the State continued to
stress to the jury that Simmons did not bring an expert witness on the issue of the drug test results
despite the obvious surprise at having to defend any allegations relating to drug use. Further, during
its cross-examination of Simmons, the State twice commented that the failed drug test was a "very
serious issue" for the jury in this case. 

 As to the strength of the State's evidence, we note this was a classic swearing match between
the only two witnesses to the event; the complainant alleged facts constituting an assault, while the
defendant denied such an attack. Further, these parties had recently been involved in an apparently
bitter divorce proceeding involving custody of the children. Having considered the entire record,
the nature of the evidence of the drug test evidence in light of the other evidence and the degree to
which the State emphasized the drug test results, we cannot say we are fairly assured the error in
admitting the evidence did not influence the jury. Nor can we say the highly-emphasized evidence
had but a slight effect. We sustain this point of error. 


 Since this issue is dispositive of this appeal, we need not address the other evidentiary issues
raised by Simmons. We reverse the trial court's judgment and remand the case for a new trial. 



 Jack Carter

 Justice


Date Submitted: October 31, 2007

Date Decided: December 14, 2007


Do Not Publish

1. Although an assault on a family member is generally a class A misdemeanor, a second
conviction for assault on a family member is considered a third-degree felony. See Tex. Penal
Code Ann. § 22.01(b)(2) (Vernon Supp. 2007). There is no such evidence for enhancement in the
instant case.
2. See Tex. R. Evid. 403, 609.
3. There was significant dispute over whether Christie effectively abandoned her application
for a protective order or whether the family court judge refused to issue a protective order based on
uncontroverted evidence that Christie visited Simmons at his home after the alleged assault. There
is nothing in the record before us that would definitively provide an answer to this dispute. 
4. Since Simmons presented his defensive theory in his opening statement to the jury and
developed it during cross-examination of the State's first witness, the State was allowed to introduce
evidence to rebut the defensive theory during its case-in-chief. See Powell, 63 S.W.3d at 438-39.