In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00034-CR


______________________________




SUSIE ANN PICKROM, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 124th Judicial District Court


 Gregg County, Texas


Trial Court No. 34,043-B




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Susie Ann Pickrom, appellant, has filed with this Court a motion to dismiss her appeal. The
motion is signed by Pickrom and by her counsel in compliance with Rule 42.2(a) of the Texas Rules
of Appellate Procedure. See Tex. R. App. P. 42.2(a). As authorized by Rule 42.2, we grant the
motion. See Tex. R. App. P. 42.2.

 Accordingly, we dismiss the appeal.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: April 24, 2008

Date Decided: April 25, 2008


Do Not Publish






married in early 2002. From a prior relationship, Mary had two sons, Chad
Weaver and Kevin Hailey. Chad and Kevin had both spent time in prison and may have been a
source of some tension between Mary and Mike. Mary supported her sons and Chad's wife, Donna. 
By most accounts, there was a great deal of fighting and drug use among Mary, her sons, and Donna. 
Ultimately, Chad approached the police with information suggesting Mary was involved in Mike's
death. 

 (b) Suicide or Homicide?

 On December 13, 2002, the Atlanta Police Department received a call reporting that Mike
had suffered an apparently self-inflicted gunshot wound. When Sergeant Mark West arrived at the
family's trailer home, he found Mike dead on a waterbed. Mike's left hand lay across a Bible, and
a cross pendant lay across his hand. Underneath the fingers of his left hand was also a torn piece of
paper bearing a note written in Mike's hand which read, "To my wife, the one thing I cannot live
without is you. I love you." All involved agree that the note was in Mike's handwriting and that the
bottom portion of the paper that had been torn off the note was never recovered. 

 The scene suggested Mike shot himself. A deer rifle lay under the covers and was placed
under his chin--his right thumb located near the trigger. West testified that the position of Mike's
hands was unusual since such a high-powered rifle would appear to require two hands to operate. 
Unexplained was the towel beneath Mike's body. No identifiable fingerprints were found on the note
or on the rifle. It was suggested at trial that the lack of fingerprints on the gun was attributable to
the "bluing" of the metal on the rifle. The bullet that killed Mike struck the bedroom wall between
the headboard and the mattress and exited the trailer house at a downward angle, but the bullet was
never found. Gunshot residue tests were not performed. 


 (c) Mary's Written Statements

 Mary gave a statement December 17, 2002, that provided one version of events:

 On Friday, 12/13/02, at approximately 6:00 p.m., Mike came in from work and
seemed very tired. He sat on the couch and we talked for a while. I asked him if he
wanted to take a shower while I cooked supper. He said yes and then went and took
a shower while I cooked. After his shower, we ate supper in the bedroom. After we
were finished eating, we watched TV for a while. Then my mother called around
bedtime and told me to come get my dog. I walked to my mother's house, which is
next door, to get my dog. While I was there, I asked my mother to [o]pen her
Christmas present. She opened her present and then I got my dog and left. I was at
my mother's house about fifteen minutes. When I walked back home, I opened the
door, and when I closed it, I heard a loud noise. I thought it may have been the
mirror falling off the wall. I walked down the hall towards the bedroom. When I got
halfway down the hall, I could smell something strange. It smelled like something
burning. I then walked into the bedroom and found Mike laying on the bed with a
rifle laying across his body. I immediately called 9-1-1 and asked the operator how
to do CPR. She told me there would be someone there in just a minute, so I hung up. 
Mike's hand was laying on a Bible that I had bought for him, and he also had a
necklace that I bought for him across his hand. He also left a note, and I vaguely
remember reading it. I am not sure if I picked it up or not. About this time, the
police officer arrived.

 On February 24, 2004, Mary gave another written statement, that varied in some respects
from her earlier statement:

 On 12/13/02, I was at home with my husband, Mike Scott. We had supper between
6:00 and 7:00 p.m. in the bedroom. Mike and I laid there and watched television. 
At about 10:00 p.m., I went to my mother's house next door to get my dog and to give
her her birthday present. I walked back to my house holding my dog, and I walked
in the door and I heard a strange noise that sounded like a pop. I thought my mirror
had fallen on the floor, and I walked back to the back bedroom. The first thing I saw
was Mike laying on the bed and I saw a deer rifle on Mike, and it was between his
legs and he was turned a little bit on his left side facing me. I reached over and took
his left hand and held it. I then called 9-1-1 for help, using the telephone in the
bedroom on the nightstand on my side of the bed. I told the operator I did not know
how to do CPR. After the 9-1-1 call, I called Sondra and Eugene Smith and told
them Mike had just shot himself. They told me, we'll be right there. After I hung up
with Sondra, I knelt beside the bed and prayed. The Bible was on the bed, and I
believe I picked it up from the foot of the bed and laid the Bible underneath his hand. 
I took the necklace that was on the nightstand lamp, where I had hung the necklace
the night before. I laid the necklace across Mike's hand. I picked the note up that
Mike had written and read the note and laid the note back [down]. The police started
arriving, and when they came in they asked me to leave the room, and Sondra and
Eugene came along with Mandy Wise and we joined hands and prayed.


Mary's second statement adds some inconsistent details such as the fact that the Bible had been at
the foot of the bed and that Mary had placed the Bible under Mike's hand after she had found his
body.

 (d) Mary's Interest in Mike's Life Insurance

 The jury heard evidence that Mary was very interested in the life insurance policy that had
been issued through Mike's employment. Stephanie Grimaldi testified that she had worked with
Mike at Harmon Glass for ten years and that Mike had made Mary the beneficiary of his life
insurance policy shortly after their marriage. Mike had asked Grimaldi to write an explanation of
the benefits so that he could better explain them to Mary. Mike later asked Grimaldi to speak with
Mary by telephone so that Mary could understand the benefits. 

 (e) Mike's Conversations with Friends the Night of His Death

 Between 7:00 and 7:30 on the night of his death, Mike spoke with Jack Hines, his friend of
over thirty years. The two had originally planned to leave that night to go to a deer camp, but Hines
had to cancel the trip due to illness. Hines testified that he did not note anything peculiar about
Mike's demeanor and that the two had laughed together that night. Similarly, Rocky Moses, who
also talked to Mike the night of his death, testified that Mike did not seem to be depressed at the
time. 

 (f) Conflicting Forensic Evidence

 Dr. Jeffrey Barnard is the chief medical examiner of Dallas County and the director of the
Southwestern Institute of Forensic Sciences. Barnard explained that the original autopsy report listed
the cause of Mike's death as a gunshot wound to the head and the manner of death as suicide. Later,
Barnard's department changed its opinion, concluding that Mike's death was a homicide. Barnard
explained that this change in opinion was partly based on conversations with investigators. 
Particularly, he explained that the decision to change the opinion on the manner of death was based
on data regarding the position of Mike's left hand, crime scene photographs, and investigative results. 
Barnard testified that it would be unusual, but not impossible, to find a person's hands in the position
in which Mike's were found if that person had committed suicide. 

 Dr. Vincent DeMaio was the chief medical examiner of Bexar County. He testified that the
evidence supported the initial conclusion that Mike had died from a self-inflicted gunshot wound. 
DeMaio described the wound as a "hard contact" wound in which the gun was pressed into the chin. 
To support the suicide theory, he also pointed to the superficial cut on Mike's right thumb, which he
described as consistent with an injury caused by the recoil of the gun when the thumb is used to pull
the trigger. He disagreed that it would be unusual to handle the gun with one hand. 


 (g) Mary's Conversations with Chad

 Chad testified that, following Mike's death, Mary started telling Chad about Mike's death and
her justification for it. The police made arrangements with Chad to record a conversation with Mary
regarding Mike's death. The first attempt at recording a conversation failed due to technical
problems. Later, however, Chad managed to record a conversation with Mary in which she, again,
seemed to offer her rationale for having killed Mike:

 Chad: Now Melinda told Donna some stuff. Did you have gloves on when
you touched that gun and put it up under-under-however you put it
in there?

 Mary: Well, the thing is, any of us could have touched the gun.

 Chad. I know.

 Mary: Our DNA being on there don't matter.

 Chad: I'm just saying.

 Mary: The first thing you could--first thing you have to say, you weren't
here.

 Chad: I know.

 Mary: You've got a witness.

 Chad: You had Kevin to take me out of here.

 Mary: Okay, you weren't here. Okay. Of course you looked at Mike's guns,
you were interested in them. You're--

 Chad: Well, I mean you had me to check it and--

 Mary: I didn't know how. I didn't know how. But what I'm trying to tell you
Chad, what I--you won't listen to.

 Chad: And then here Kevin threatens you with it and you pay him $5,000.00.

 Mary: Well, when I get $5,000.00 I'll see that you get it.

 Chad: I don't want your money.

 . . . .

 

 Chad: Well. I mean why did you have to kill him? He didn't f***ing
deserve it.

 Mary: You don't understand. You don't understand. You and Kevin were
both going to have to leave. If--you don't understand that he can
bury me and neither of ya'll were here. Neither one of y'all were here,
Chad. Neither one of you were here. And everything was just loving
and gorgeous. He got to where he'd lock mama and Kevin out by
8:00. And boy, when he found out you were coming home, he went
berserk. He went crazy. And I had two children that had been in
prison that I loved dearly and I missed y'all so da** bad I couldn't
hardly stand it. My life ever since--every day of my life I got up
crying, Chad. Every day. It was horrible.

 Chad: Well, he didn't deserve to die for that.

 Mary: No, he didn't deserve to die for that and if I could take it back, I
would, I can't. But what I'm trying to make you understand, he was
going to make you and Kevin both move out. And I said, well, why
don't you just move out? He said, I ain't going nowhere. You just
don't understand, Chad. I wanted y'all to have a start. I wanted y'all
to have something. And y'all spent everything, everything I gave you
on crack.

 Chad: Mother, Kevin went and blowed that money you gave him on crack.

 Mary: I know. And I was hoping you'd do better.

 Chad: Well, I ain't . . . . (inaudible).

 Mary: But, Chad, you just don't realize how miserable I was.

 Chad: Well, you think--I mean, you could have got me in trouble for some
of that sh**.

 Mary: There ain't no way. All you would have had to say is--

 Chad: I ain't had to say nothing because I didn't know nothing about it.

 Mary: Well, they've taken my DNA. They can't get a match. If you'll keep
your da** mouth shut, they can't get a match. It's been a year and a
half, they'd already arrested me. They can't get a match. Can you
imagine how many people have handled that gun?


 (h) Evidence at Issue

 During the State's rebuttal, it presented the testimony of Thomas Templeton, one of Mary's
ex-husbands. He described two incidents in which Mary shot at him. During the first incident, Mary
and Templeton had been arguing. He explained that Mary stood at the end of the bed on which he
was lying and fired the gun at him, hitting a spot just above his head. In a later incident, Mary shot
him during another argument. In the second incident, as Templeton was leaving the bathroom, he
testified, Mary held a pistol and threatened to shoot off his genitalia. This time she fired and hit
Templeton about mid-thigh. Mary was convicted for assault causing bodily injury in connection
with this second incident. 

(2) Rule 404(b): Evidence of Extraneous Bad Acts Was Relevant Apart from Character
Conformity


 At trial, the State argued in favor of the admission of this evidence, maintaining that
Templeton's testimony was evidence of Mary's motive, method of operation, common scheme, and
the "entire laundry list" included under Rule 404(b). 

 (a) Standard of Review

 Because the trial court is in the best position to determine substantive admissibility issues,
an appellate court must review the trial court's admissibility decision for an abuse of discretion. See
Robbins v. State, 88 S.W.3d 256, 262 (Tex. Crim. App. 2002); Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1990) (op. on reh'g). Under this standard of review, we will uphold a trial
court's decision regarding admissibility so long as that decision is within the zone of reasonable
disagreement. See Robbins, 88 S.W.3d at 262; Santellan v. State, 939 S.W.2d 155, 168-69 (Tex.
Crim. App. 1997). We should uphold a trial court's decision if it is correct on any theory of law
applicable to the case "even when the trial [court] gives the wrong reason for his decision." Robbins,
88 S.W.3d at 262 (quoting Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). 

 (b) Admission of Evidence Under Rule 404(b) Generally

 To guard against an accused being prosecuted for some collateral crime or misconduct, the
State may not, as a general rule, introduce evidence of bad acts similar to the offense charged. 
Roberts v. State, 29 S.W.3d 596, 600-01 (Tex. App.--Houston [1st Dist.] 2000, pet. ref'd). Rule
404 provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character
of a person in order to show action in conformity therewith." Tex. R. Evid. 404(b). Evidence of
extraneous misconduct may be admissible, however, when it is relevant to a non-character-conformity "fact of consequence" in a case, such as establishing motive, opportunity, intent,
preparation, plan, knowledge, identity, absence of mistake or accident, or rebutting a defensive
theory. Id.; Robbins, 88 S.W.3d at 259; Lane v. State, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996).

 The list included in Rule 404(b) is not exhaustive. "If it were intended for the Rule to allow
an exception only for proof of motive, opportunity, intent, preparation, plan, knowledge, identity,
or absence of mistake or accident, then it would not have included the phrase 'other purposes, such
as.'" Garcia v. State, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006). This language makes clear that
there are additional "other purposes" for which evidence of prior acts may be admitted. Id. The
Texas Court of Criminal Appeals has stated that "evidence will be relevant to a material issue if the
purpose for which the party seeks to have it submitted tends to make 'the existence of any fact that
is of consequence to the determination of the action more probable or less probable than it would
be without the evidence.'" Smith v. State, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999).

 "If the opponent of extraneous offense evidence objects on the grounds that the evidence is
not relevant, violates Rule 404(b), or constitutes an extraneous offense, the proponent must satisfy
the trial court that the extraneous offense evidence has relevance apart from its character conformity
value." Santellan, 939 S.W.2d at 168-69. If the trial court determines the evidence has no relevance
apart from supporting the conclusion that the defendant acted in conformity with his or her character,
it is absolutely inadmissible. Id.; Montgomery, 810 S.W.2d at 387. On the other hand, extraneous-offense evidence is admissible if the proponent persuades the trial court that the extraneous evidence

 tends to establish some elemental fact, such as identity or intent; that it tends to
establish some evidentiary fact, such as motive, opportunity or preparation, leading
inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g.
absence of mistake or accident . . . [or] that it is relevant upon a logical inference not
anticipated by the rulemakers.


Montgomery, 810 S.W.2d at 387-88; see also Taylor v. State, 920 S.W.2d 319, 321 (Tex. Crim.
App. 1996). Put another way, the evidence must be relevant to a factor of consequence contested
in the case. See Rankin v. State, 974 S.W.2d 707, 718-19 (Tex. Crim. App. 1996); Prince v. State,
192 S.W.3d 49, 54 (Tex. App.--Houston [14th Dist.] 2006, pet. ref'd).

 Evidence of other crimes, wrongs, or acts has non-character-conformity relevance where the
evidence tends to weaken defensive evidence that undermines an elemental fact. See Robbins, 88
S.W.3d at 262; Montgomery, 810 S.W.2d at 387. The range of material issues in each case will
depend on the theories of the prosecution and the defense in that case. See Garcia, 201 S.W.3d at
703; Smith, 5 S.W.3d at 679 n.13.

 (c) Relevance to Elemental Facts: Action and Identity

 Here, the challenged evidence is relevant to an elemental fact other than Mary's acting in
conformity with character. A person commits murder if he or she intentionally or knowingly causes
the death of an individual. See Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003). The
challenged evidence is relevant to whether Mary committed an intentional act that caused Mike's
death.

 We rely generally on Robbins in which the Texas Court of Criminal Appeals held that
evidence of extraneous acts was admissible in a capital murder case to rebut the defensive theory that
the victim died by some means other than an intentional act of Robbins. 88 S.W.3d at 259-63. 
Take, for instance, Robbins' theory that the bruises on the infant victim's body were caused by his
poorly performed CPR technique. See id. at 258. During its examination of whether evidence of
prior injuries to the infant victim (2) while in Robbins' care was relevant to the element of intent, the
Texas Court of Criminal Appeals considered it "crucial" that Robbins went beyond a simple plea of
not guilty by advancing this and other defensive theories that would explain the infant's death. See
id. at 261. The court concluded that, through vigorous cross-examination and the presentation of
defensive theories, Robbins did put at issue his intent: "[W]e cannot say that the trial court would
have been outside the zone of reasonable disagreement to have decided that the relationship evidence
was relevant to appellant's intent." See id.

 Mary, too, went beyond a simple plea of not guilty and in doing so, put at issue the shooter's
identity. Throughout the trial, Mary undermined the evidence that she committed any act to satisfy
the elements of murder by advancing her theory that Mike committed suicide. From the beginning
of the investigation, the theory that Mike had committed suicide was significant in this case. The
responding officers first viewed the scene as a suicide. The initial autopsy, although performed
without reference to the crime scene photographs, also ruled Mike's death a suicide. Through both
cross-examination of the State's witnesses and direct examination of her own witnesses, Mary
vigorously advanced the theory of Mike's suicide, that is, that she did not directly cause Mike's death.

 We recognize that the CPR theory in Robbins varies to some extent from Mary's suicide
theory. While both defensive theories directly challenge an element of the offense, the CPR theory
implicates the intent element. Here, Mary did not argue that she did not intend to kill Mike; she
argued that she did not shoot him at all. In that respect, the other theory advanced in Robbins is,
perhaps, even more analogous to the instant case. Robbins also contended the victim died as a result
of Sudden Infant Death Syndrome (SIDS). In doing so, Robbins, in much the same way as does
Mary, attempted to undermine the evidence that he performed any act that would cause the death of
the infant.

 Relying on the reasoning of Robbins and a detailed examination of the circumstances of the
instant case, we conclude that the evidence of Mary's prior bad acts was relevant to rebut the
evidence she presented that undermined an elemental fact determination whether Mary committed
any act constituting murder. According to Mary's theory and her evidence, Mike committed suicide. 
This evidence goes to the very fundamental fact of consequence, whether there was an act of murder. 
On that basis, the trial court could have reasonably concluded that the evidence at issue was relevant
apart from its tendency to show character conformity. Put in the traditional formulation of
Montgomery and Robbins, the evidence of extraneous bad acts tended to undermine Mary's evidence
of suicide.

 Similarly, the evidence in question goes to the issue of identity, but not in quite the same way
as many of the cases that address the issue of identity. That is to say, the evidence is undisputed that
Mike was fatally shot. Since the evidence narrowed the list of possible shooters to only two
people--Mary and Mike--the identity of that person is most certainly a fact of consequence. Since
Mary puts at issue the identity of the person who shot Mike, the evidence of extraneous offenses is
relevant to rebut the claim that Mike shot himself and tends to establish that Mary, the only
alternative, was the shooter. It is, at a minimum, also subject to reasonable disagreement whether
the extraneous-offense evidence made the defensive theory of suicide less probable. See Powell v.
State, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).


 (d) Simple Rebuttal of Defensive Theory of Suicide

 Recognizing that it need not rely solely on the intent basis for upholding the trial court's
admission, the Robbins court concluded more explicitly that the extraneous-offense evidence was
also relevant simply as a means of rebutting the defensive theories urged at trial. See Robbins, 88
S.W.3d at 262. Here, the evidence most certainly serves as a rebuttal to Mary's theory that Mike
committed suicide.

 (e) Concerns Regarding Similarity of Acts 

 Mary relies on Owens v. State, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992), in arguing here
that the extraneous acts were not so similar to the charged offense that they would fall within an
exception of Rule 404(b). The Owens trial court had admitted evidence of a prior sexual assault of
a young female on the basis that such evidence established a "system," (3) and the Texas Court of
Criminal Appeals analyzed that basis as one relating to Owens' "modus operandi" or "methodology." 
See id. at 914-15. That court concluded that the extraneous offense was not so similar to the charged
offense that it would establish such a "system." Specifically, the Owens court observed that:

 [w]hen the State seeks to admit extraneous offense evidence under a theory of
"system" or modus operandi, "there must be a showing that the extraneous offense
which was committed by the defendant was 'so nearly identical in method [to the
charged offense] as to earmark them as the handiwork of the accused.'"

Id. at 915. The Owens court then concluded that the extraneous offense and the charged offense
were not so idiosyncratically similar as to show that "the two offenses were the handiwork of the
same individual." Id.

 We note that the Owens court analyzed the admission of the evidence to determine whether
such evidence was relevant as a showing of a "system" of operation. There, the State failed to reach
the requisite high standard in showing similarity between the extraneous acts and the charged
offense. Id. Here, as we have explained, the nature of the charged offense and the defensive theory
have led us to conclude that the evidence of extraneous bad acts was relevant to other factors of
consequence. Owens is thus distinguishable from the case at bar. See Garcia, 201 S.W.3d at 703.

 (f) Trial Court Did Not Abuse Its Discretion in Ruling the Evidence Properly Relevant
Under Rule 404(b)


 It is within the zone of reasonable debate to conclude that the evidence of the two prior
shootings was relevant to the shooting in this case and to the identity of the individual who shot
Mike. Such evidence also serves simply as a rebuttal to Mary's theory that Mike committed suicide. 
Keeping in mind the deferential appellate standard of review, we cannot say that the trial court
abused its discretion when it deemed the evidence of extraneous bad acts relevant to an elemental
fact of consequence in this case, apart from its tendency to show conformity with character. (4) See
Robbins, 88 S.W.3d at 261.

(3) Rule 403: Balancing the Probative Value with the Danger of Unfair Prejudice

 Evidence deemed relevant under Rule 404(b) may nonetheless be excludable under Rule 403
if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay or needless presentation of
cumulative evidence. Tex. R. Evid. 403; Mozon v. State, 991 S.W.2d 841, 846-47 (Tex. Crim. App.
1999). Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be
made on an improper basis, commonly, but not necessarily, an emotional one. See Mozon, 991
S.W.2d at 847 n.7.

 In conducting a Rule 403 balancing test, a trial court should consider the following factors:
(a) the probative value of the evidence; (b) the potential of the evidence to impress the jury in some
irrational, but nevertheless indelible way; (c) the time the proponent needs to develop the evidence;
and (d) the proponent's need for the evidence. See Wyatt v. State, 23 S.W.3d 18, 26 (Tex. Crim.
App. 2000). The Rule 403 balancing test carries a presumption that relevant evidence will be more
probative than prejudicial. See Rayford v. State, 125 S.W.3d 521, 529 (Tex. Crim. App. 2003);
Williams v. State, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997).

 (a) Probative Value

 The first factor weighs in favor of the State. As discussed earlier in our Rule 404(b) analysis,
evidence of the extraneous offenses was probative to make it more probable that Mary was the
shooter and to rebut Mary's defensive theory that Mike committed suicide. See Powell, 63 S.W.3d
at 438 (State may offer evidence of extraneous offense to rebut defense of "lack of opportunity");
Waddell v. State, 873 S.W.2d 130, 136 (Tex. App.--Beaumont 1994, pet. ref'd) (extraneous acts
were logical and necessary rebuttal of defensive theory of fabrication). Several factors have been
used to measure the probative value of an extraneous offense: (1) similarity between the extraneous
act or offense and the offense charged, (2) closeness in time (5) of the extraneous transaction to the
charged offense, and (3) availability of alternative sources of proof. See Robinson v. State, 701
S.W.2d 895, 898 (Tex. Crim. App. 1985).

 Here, the extraneous acts were quite similar in that the relationship and context were much
the same as those present in the charged offense: all were between spouses and sprung from
disagreements, even disagreements over children. Also, Mary's approach to resolution in the
extraneous acts was similar to that alleged by the State in the instant case. Though separated by
some time, the events involved two successive marriages, keeping the probative value high. As to
the availability of alternate sources of proof, we note that the forensic evidence was conflicting on
the homicide-or-suicide dichotomy. Two experts in forensic pathology came to opposite conclusions
on the matter. While the recorded conversation between Chad and Mary represents alternate proof
of Mary's guilt, it did not constitute an absolute admission.

 The evidence of extraneous acts has strong probative value. 

 (b) Potential Impact on Jury

 The second factor weighs in Mary's favor. The evidence of these extraneous offenses does
have some potential to impress the jury in some irrational, yet indelible way. Evidence suggesting
that Mary has developed a pattern of shooting her husbands when faced with marital conflict would
likely influence the jury here where the central issue was whether she shot Mike or whether Mike
shot himself.




 (c) Time Necessary for Development

 The third factor weighs in favor of the State. The State presented Templeton's testimony in
approximately five pages of the seven-volume record. The limited time needed to develop
Templeton's testimony supports its admission.

 (d) Need for Evidence

 The fourth factor also weighs in favor of the State. Mary presented DeMaio's testimony that
contradicted the State's theory and strongly suggested that Mike, in fact, committed suicide. With
the conflicting opinions of the forensic experts, the State's need for this evidence was fairly
substantial. However, undermining the State's need for this evidence is Mary's own conversation
with her son. While Mary's statements strongly suggest that she, not Mike himself, caused his death,
her statement never plainly admits that she killed him. This factor weighs in favor of admitting the
extraneous-act evidence.

 Based on an evaluation of the Rule 403 factors, we conclude that the trial court did not abuse
its discretion in determining that the danger of unfair prejudice did not substantially outweigh the
probative value of this evidence. Accordingly, we overrule Mary's contention.

(4) Conclusion

 Since the evidence that Mary had twice shot at a former husband was relevant aside from its
tendency to show that Mary acted in conformity with bad character, and since the danger of unfair
prejudice did not substantially outweigh the probative value of this evidence, the trial court did not
abuse its discretion by admitting such evidence.

 We affirm the judgment of the trial court.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: March 7, 2007

Date Decided: April 20, 2007


Do Not Publish


1. We will use the first names of Mary and Mike to avoid confusion.
2. We note this distinction between Robbins and the instant case. Robbins involved evidence
of extraneous acts against the same infant who would eventually become the homicide victim. Such
is not the case here; the prior shootings were directed at a prior husband. However, we think the
reasoning of Robbins still applies here.
3. The Texas Court of Criminal Appeals noted that Rule 404 did not specifically mention a
"system" exception and suggested that this "system" exception may have also referred to the
"common plan or design" exception. See Owens, 827 S.W.2d at 915 n.4.
4. Although we conclude that the trial court did not abuse its discretion by ruling the evidence
properly relevant, we pause to acknowledge the position of those who might take the contrary
position. To that position, we conclude that any error that would have stemmed from admission of
the evidence of the prior shooting would have been harmless error on these facts. When we consider
the inconsistencies of her written statements and, most obviously, the incriminating nature of some
of the statements Mary made to Chad, we conclude that any error associated with admission of this
evidence would not have affected Mary's substantial rights. See Tex. R. App. P. 44.2(b); Tex. R.
Evid. 103.
5. Mary contends that we must consider the time that has elapsed between the extraneous acts
and the charged offense. Under certain circumstances, we are called on to consider the remoteness
of the extraneous offenses: "In addition to similarity, remoteness is another factor to be considered
in determining whether the extraneous offense bears the defendant's signature." Reyes v. State, 69
S.W.3d 725, 740 (Tex. App.--Corpus Christi 2002, pet. ref'd). However, here, we are not concerned
with whether the charged offense bore Mary's signature and, therefore, we need not measure the
offenses with such exacting standards of similarity and proximity. Rule 404 contains no express
time limitation. See Templin v. State, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986); Prince, 192
S.W.3d at 55.